IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| *Plaintiff*, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| 8.929 ACRES OF LAND, MORE OR | ) | Civil No. 1:20-cv-00667 |
| LESS, SITUATED IN ARLINGTON | ) | |
| COUNTY, VIRGINIA; | ) | |
| | ) | |
| and | ) | |
| | ) | |
| ARLINGTON COUNTY, VIRGINIA, *et al.* | ) | |
| | ) | |
| *Defendants*. | ) | |

**DEFENDANT ARLINGTON COUNTY'S RESPONSE TO PLAINTIFF'S RULE 71.1
MOTION TO DETERMINE THAT FAIR MARKET VALUE HAS NO RELEVANCE TO
THIS PROCEEDING**

# TABLE OF CONTENTS

INTRODUCTION ..............................................................................................................1

BACKGROUND .............................................................................................................4

      A.     The County's Valuable Southgate Parcel Was Taken. ...............................5

      B.     The County Never Agreed to Accept "Substitute Facilities" as Just Compensation for Taking the Southgate Parcel. ...........................8

      C.     Before Its About-Face, the United States Took a Position Consistent with the County on the Value of the Southgate Parcel. ......................................................................................................9

      D.     South Nash Street Is an Amenity for the United States, Not "Double Compensation" for the County. ..................................................11

ARGUMENT ...................................................................................................................12

    I.     The United States Has Not Filed a Proper Rule 71.1(h) Motion. .........................12

    II.    The United States Cannot Invoke the Substitute Facilities Doctrine to Avoid Paying Fair Market Value to the County. ............................................16

    III.   The United States Fails to Prove an Absence of Disputed Issues of Material Fact Regarding Just Compensation. .......................................................20

CONCLUSION .................................................................................................................21

# TABLE OF AUTHORITIES

**Cases**

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986).................................................................15

*Brown v. United States*,
263 U.S. 78 (1923).................................................................18

*Celotex Corp. v. Catrett*,
477 U.S. 317 (1986) ..............................................................14

*Greater Balt. Ctr. for Pregnancy Concerns, Inc. v. Mayor & City Council of Balt.*,
721 F.3d 264 (4th Cir. 2013)...............................................15

*Greensill Capital (Uk) Ltd. v. Tempus Intermediate Holdings, LLC*,
No. 4:17-cv-127, 2018 WL 1937063 (E.D. Va. Apr. 24, 2018) ...........................................15

*Hous. Auth. Risk Retention Grp., Inc. v. Chicago Hous. Auth.*,
378 F.3d 596 (7th Cir. 2004).................................................15

*Kirby Forest Indus. v. United States*,
467 U.S. 1 (1984) ............................................... 3, 16, 17, 21

*Olson v. United States*,
292 U.S. 246 (1934) ..............................................................16

*Town of Clarksville v. United States*,
198 F.2d 238 (4th Cir. 1952).................................................19

*United States v. 10.56 Acres, more or less, in Whatcom Cty.*,
No. C07-1261, 2010 WL 415244 (W.D. Wash. Jan. 27, 2010).......................................19, 20

*United States v. 10.56 Acres, more or less, in Whatcom Cty.*,
No. C07-1261, 2008 WL 3977614 (W.D. Wash. Aug. 22, 2008).............................................20

*United States v. 1.604 Acres of Land*,
844 F. Supp. 2d 668, 679 (E.D. Va. 2011) ...........................14

*United States v. 50 Acres of Land* ("*Duncanville*"),
469 U.S. 24 (1984) ...........................................................17, 18

*United States v. 320.0 Acres of Land, more or less in Monroe Cty.*,
605 F.2d 762 (5th Cir. 1979).................................................16

*United States v. 15,478 Square Feet of Land*,
No. 10-322, 2011 WL 2471586 (E.D. Va. June 20, 2011) ......................................14

*United States v. Miller*,
   317 U.S. 369 (1943) ............................................................................16

*United States v. Reynolds*,
   397 U.S. 14 (1970) ............................................................................14

*United States v. Streets, Alleys and Public Ways in Stoutsville*,
   531 F.2d 882 (8th Cir. 1976)..........................................................19

*United States v. Werner*,
   36 F.3d 1095 (4th Cir. 1994)..........................................................14

## Constitutional Provisions

U.S. Const. amend. V ............................................................................16

## Statutes

42 U.S.C. § 4651, 4651(2), 4651(3)........................................................4

## Rules and Regulations

23 C.F.R. § 660.551 ............................................................................12

Fed. R. Civ. P. 12 ............................................................................15

Fed. R. Civ. P. 56 ......................................................................14, 15

Fed. R. Civ. P. 71.1 ...............................................................*passim*

Fed. R. Civ. P. 71A(h) (former)........................................................14

Local Civ. R. 56 ............................................................................15

## Additional Authorities

*Environmental Assessment for the Southern Expansion and Associated Roadway
   Realignment*, U.S. Army Corps. Of Eng'rs (August 2019) ..................6, 11

Fed. R. Civ. P. 71A Comments, *Advisory Committee Original Report*  (1951) .........................14

*Joint Base Myer-Henderson Hall Website* ............................................................11

*Programmatic Environmental Assessment for Arlington National Cemetery Real
   Property Master Plan* (December 2014) ............................................................10

*Uniform Appraisal Standards for Federal Land Acquisitions,
   U.S. Dept. of Justice* (2016)........................................................19

**INTRODUCTION**

Fair market value always has relevance to a federal condemnation proceeding. Plaintiff's Motion (ECF No. 50) eschews this bedrock principle of constitutional law repeatedly affirmed by the Supreme Court. Instead, Plaintiff prefers to declare by fiat the just compensation it owes Arlington County (the "County") for taking its valuable property (the "Southgate Parcel"). In this instance, Plaintiff unilaterally would furnish merely ten dollars and a "substitute facility" (a proposed South Nash Street) that benefits Plaintiff by preserving current access to its federal military base. What is more, Plaintiff attempts to deprive the County of even the opportunity to demonstrate the fair market value of its property—an inherently factual question dependent on discovery, testimony, and a post-trial jury verdict. Plaintiff's gambit at the outset of this case turns both Rule 71.1 and the "substitute facilities doctrine" on their heads, and should be denied.

Though styled as a "Rule 71.1 Motion," Plaintiff's Motion is no such thing. In reality, Plaintiff has filed a Rule 56 dispositive motion for summary judgment. Whether the United States can save itself money by ignoring determinable fair market value and proffering so-called "substitute facilities" is not a "preliminary matter[]" as the United States contends. Pl. Mem. of Law in Supp. of Rule 71.1 Mot. ("Pl. Mem.") 1, ECF No. 50. It is the fundamental dispute in this case. Rule 71.1(h) is not a substitute for Rule 56, and Plaintiff's Motion fails to meet the latter's requirements. The United States has not cited a single case supporting their use of Rule 71.1(h) to exclude all consideration of fair market value—let alone such a motion filed the same day as a Court-issued Rule 16(b) scheduling order. Nor can it. Plaintiff is attempting to lead the Court into a completely new and unsupported use of Rule 71.1, thereby abandoning the normal rules of civil procedure, such as a motion for summary judgment, that the United States did not use since it knows it cannot meet such requirements.

1

Because it is prematurely seeking a merits ruling on just compensation, the United States must demonstrate the absence of any disputed issue of material fact. Unfortunately for the United States, it cannot bear its burden of proof on its Motion because factual issues abound here. The United States appears to view the Southgate Parcel as simply a road. To the contrary, the County will demonstrate at trial that these 4.23 acres of prime real estate are worth several million dollars, and have a highest and best use for residential development, adjacent to an already existing residential neighborhood. Among other things, the County intends to offer expert appraisals, testimony from witnesses involving analogous development projects in the County, and evidence of the United States' own recognition of fair market value including via protracted negotiations on a federal land exchange for the Southgate Parcel. Moreover, the County never agreed to accept purported substitute facilities for the Southgate Parcel. Though the United States now penalizes the County for its years of cooperation, the parties' dialogue treated the proposed South Nash Street as principally a federal amenity accommodating the United States' need to access its military base. Further, since discovery has only just begun, the County cannot yet know what other relevant evidence Plaintiff may possess and that the County will want to use at trial.[1]

Plaintiff's Motion to preempt these fair market value factual issues construes the "substitute facilities doctrine" backwards, because the doctrine is meant to protect property owners and applies only in the rare instance where the fair market value standard would

---

[1] Plaintiff produced its initial disclosures seven days ago, largely consisting of documents already in the County's possession (e.g., from the County's own website). Plaintiff then served blanket objections stating that it would provide no documents responsive to many of the County's requests for production of documents served on Plaintiff, some of which mirrored Plaintiff's own requests to the County. Among the objections, Plaintiff repeatedly stated that fair market value is irrelevant to this case. The parties are engaging in meet and confer in an effort to resolve Plaintiff's objections without judicial intervention.

insufficiently compensate the former property owner. The Supreme Court has made clear, time and again, that just compensation "means in most cases the fair market value of the property on the date it is appropriated." *Kirby Forest Indus. v. United States*, 467 U.S. 1, 10 (1984). "Under this standard, the owner is entitled to receive 'what a willing buyer would pay in cash to a willing seller' at the time of the taking." *Id.* (citation omitted).

By contrast, "[o]ther measures of 'just compensation' are employed only 'when market value [is] too difficult to find, or when its application would result in manifest injustice to owner or public . . . .'" *Id.* at 10 n.14 (citation omitted). Yet, Plaintiff's Motion would transform the substitute facilities from a shield protecting the condemnee into a sword for the condemnor to ignore fair market value and thus avoid paying it. Here, Plaintiff would avoid paying anything of real value to the County for the acquisition of the Southgate Parcel, a large tract of valuable public land in a very high value market.

Lastly, Plaintiff's claim that its Motion is necessary to spare Plaintiff from discovery rings hollow. To be sure, well before filing its Motion, Plaintiff buried the County in discovery requests (43 broad requests for production of documents, 21 interrogatories, and 9 requests for admission) that focus on fair market value of the Southgate Parcel—the very issue that Plaintiff now argues is "irrelevant."[2] Plaintiff negotiated a discovery plan with the County and other Defendants, without raising or including threshold motions practice.[3] Regardless, the United

---

[2] Certain of the County's served requests for production mirrored the United States' own served requests, yet the United States is now objecting to those County requests.

[3] Plaintiff first broached with the County the possibility of a motion on applicability of the substitute facilities doctrine on June 18, 2020. Plaintiff never again raised the prospect of such a motion, including during meet and confer on the parties' joint discovery plan, until hours before filing its Motion on September 4. That filing occurred hours after the Court's Rule 16(b) Scheduling Order, late afternoon on the Friday before Labor Day, and with a response deadline overlapping with the County's initial disclosures and responses to document production requests. The County thus requested and the Court granted an additional 7 days to file this response.

States was obligated, in efforts "to avoid litigation," to conduct an appraisal of the subject property and to then make an offer to the County, for an amount which "[i]n no event shall . . . be less than the agency's approved appraisal of the fair market value of such property." 42 U.S.C. § 4651, 4651(2), 4651(3) (Uniform Relocation Assistance and Real Property Acquisition Policies Act or "URA"). But the County has no evidence of such an appraisal or offer. It is unclear whether Plaintiff desires to obviate the effort of even appraising fair market value, or instead whether Plaintiff has conducted this appraisal and simply does not wish to pay that substantial sum. At a minimum, further factual development is necessary on fair market value and discovery and trial preparation should proceed apace, as the Court already has ordered.

## BACKGROUND

Arlington National Cemetery has contemplated expansion for 20 years.[4] Throughout that time, Arlington County as home to the Cemetery has steadfastly supported the Cemetery's importance to honoring the fallen heroes who defended this nation in times of war. Ex. 1 (Declaration of Mark Schwartz ("Schwartz Decl.") ¶ 2. Moreover, the County has never stood in the way of Cemetery expansion to accommodate the unfortunate need for more burial capacity. *Id.* To the contrary, the County has worked closely with the United States, its agencies (including the Army), and its contractors (collectively, "United States"), to design an expansion of the Cemetery ("Project") that best accommodates all parties. *See generally* Ex. 1 (Schwartz Decl.); Ex. 2 (Declaration of Dennis Leach ("Leach Decl."); Exhibit 3 (Declaration of Timothy

---

[4] *See, e.g.*, Plaintiffs' First Set of Requests for Production of Documents to Defendant Arlington County 5-6 (defining "Project" to "include the United States' general plans to expand Arlington National Cemetery south of Southgate Road, on the former Navy Annex site and nearby land, from 1999-present").

O'Hora ("O'Hora Decl."). No party disputes the Cemetery's expansion objectives or Project's public purpose.

It also is undisputed that the associated impacts disproportionately fall on the County and its residents, principally through loss of the Southgate Parcel. As such, the County is entitled to just compensation from the United States. Despite advanced negotiations for a fair land exchange, however, the United States changed course and refused to engage in any discussion of fair market value with the County. In particular, the United States never shared a property appraisal or made a corresponding offer to the County. Instead, the United States maintains that aspects of its own Project serve as just compensation for the County, and now preemptively moves to take all discovery and evidence of fair market value completely off the table. That is untenable.

A.      The County's Valuable Southgate Parcel Was Taken.

Notably, for purposes of its Motion, the United States does not dispute that the Southgate Parcel has a determinable fair market value; in fact, the United States assumes that it does. *See* Pl. Mem. 16 n.9. That assumption is correct, and further highlights the unreasonableness of the United States' position that it can disregard fair market value at will.

The Motion's repeated references to "Southgate Road" mask the property actually taken from the County. The Southgate Parcel formerly owned by the County is not merely a road or a narrow strip of land. It consists of two parcels forming Tract 104-1, totaling approximately 4.23 acres, with a combined length of approximately 1,344 feet, and a combined width ranging from approximately 282 feet on the eastern end to approximately 108 feet on the western end. Ex. 3 (O'Hora Decl.) ¶ 12. Indeed, Schedules C and E to the United States' Complaint describe the estate taken as "Portion of Southgate Road and Adjacent Land"). ECF Nos. 1-5, 1-7. This taking stands in stark contrast to the United States' taking of specific roadways for the Project,

i.e., portions of Columbia Pike a South Joyce Street easement with no other developable use. *See* ECF Nos. 1-5, 1-7. That distinction reflects that Columbia Pike is a 4-lane urban principal arterial route, whereas Southgate Road is a minor local access road principally serving the Base. *See Environmental Assessment for the Southern Expansion and Associated Roadway Realignment*, U.S. Army Corps. Of Eng'rs, Ch. 3 at 3-40, 3-41, Figure 3-8 (August 2019) ("2019 EA").[5] Likewise, the Motion avers—and the County does not dispute—that the easement on South Joyce Street "would have no possible market value," in contrast to the Motion's contrary assumption for the Southgate Parcel. Pl. Mem. 14 n.8.

Although portions of the property have been used as a roadway, Southgate Road has never been legally dedicated as a County public right-of-way. Nor do the two deeds whereby the United States conveyed the Southgate Parcel to the County limit uses solely to public roadway purposes. Ex. 3 (O'Hora Decl.) ¶ 3. Based on its fee simple ownership, the County could utilize or dispose of the Southgate Parcel however the County deemed appropriate so long as it comported with all applicable laws. Thus, existing roads owned in fee like Southgate Road are legally no different any other County-owned land, and the road use can be discontinued and the land used for any purpose allowable under County law.[6]

The Southgate Parcel has a highly desirable location. Ex. 3 (O'Hora Decl.) ¶ 13. It is a short distance from the Pentagon, Pentagon City, Crystal City, National Airport, a Virginia Railway Express commuter rail station, and multiple Metrorail stations. It is adjacent to Joint Base Fort Myer/Henderson Hall ("Base"). It has direct access to I-395, Washington Boulevard,

---

[5] https://usace.contentdm.oclc.org/utils/getfile/collection/p16021coll7/id/12975.
[6] Even if the Southgate Parcel were considered as dedicated to a public street, under Virginia law such use can be abandoned, and the parcels then converted to other uses. *See* Va. Code Ann. § 33.2-915.

Columbia Pike, and other major roadways to major employment centers (including the new Amazon HQ2 headquarters), retail areas, and recreational amenities in the region.

Though currently zoned S-3A for public use, the property reasonably would support residential development. *Id.* The County has a longstanding housing shortage relative to demand, even before the expected addition of 25,000 jobs from HQ2. The property's size and configuration are sufficient to support placement of row townhouses or low-rise to mid-rise condominiums or apartments. Residential use already exists in the immediate area at the Foxcroft Heights neighborhood (bordering the proposed South Nash Street). *See, e.g.*, Pl. Mem. at 6; Ex. 2 (Leach Decl.) attached Ex. B. Were the County still the property owner, it is reasonably probable that the County (as both the owner and the zoning authority) would approve a rezoning of the parcels that would permit a highest and best use of the property for residential redevelopment (e.g., R2-7 or RA8-18 zoning). Each year, Arlington County engages in public street sales and vacations for monetary compensation to facilitate requests for proposed new development and redevelopment within the County. Ex. 3 (O'Hora Decl.) ¶ 10. These data points further illustrate the reasonableness of residential development and inform the fair market value of the Southgate Parcel.

Accordingly, an appraisal of the Southgate Parcel is necessary to determine its highest and best use and fair market value. Arlington County commissioned an independent, professional appraisal by O'Neill & Associates, L.C. in conjunction with negotiations with the United States regarding a potential land exchange of the Southgate Parcel for other federal property. Ex. 3 (O'Hora Decl.) ¶ 11. That appraisal confirmed the high value of this unique property for private development. *Id.* ¶ 13. Since then, the County has commissioned and is awaiting completion of an updated appraisal by O'Neill & Associates. *Id.* ¶ 14. Meanwhile, the

County has never received an appraisal from the United States for the Southgate Parcel (or any property taken for Project), and knows of none.

**B.     The County Never Agreed to Accept "Substitute Facilities" as Just Compensation for Taking the Southgate Parcel.**

The County has consistently maintained that the United States must pay fair market value to take the Southgate Parcel. The United States erroneously posits that the County already agreed to South Nash Street as just compensation. The Motion's misleading narrative conflates the County's cooperation on Project design with agreement on just compensation, which is non-existent.

To be sure, because its own land is at stake, Arlington County has actively participated in various iterations of the Project over the years. What choice did the County have? After all, the United States has unquestioned authority ultimately to take the subject property for Cemetery expansion. Following years of discussions, the parties reached an agreement in principle on a southern realignment of the Columbia Pike roadway, a major County thoroughfare, to add a greater amount of future burial capacity. Ex. 1 (Schwartz Decl.) ¶¶ 3-6, 9; Ex. 3 (O'Hora Decl.) ¶ 6. The United States also made clear its intention to maximize the Cemetery expansion by acquiring the entire Southgate Parcel to the north. Ex. 2 (Leach Decl.) ¶ 2; Ex. 3 (O'Hora Decl.) ¶ 3. As such, the County accepted that fate and likewise took part in the Project design for that area. The sum total of these facts and those alleged in the United States' Motion is that the parties worked together on the United States' design of the Project (i.e., "collaborated" per the Motion's oft-used term). That the County "supports" the result of that collaboration is irrelevant. *See* Pl. Mem. 11.

What the Motion does not allege is that the parties agreed on the County's just compensation for the Southgate Parcel (which otherwise may have mooted this case). That issue

8

remains the linchpin of the parties' disagreement, and is now the sole issue presented in this case. *See* Ex. 1 (Schwartz Decl.) ¶¶ 10-12. The Motion, for example, clearly sets forth the United States' proposal: "[t]o replace Southgate Road, a new segment of South Nash Street will be constructed on the western boundary of the former Navy Annex site." Pl. Mem. 5-6. Thus, despite the United States' attempt to blur the lines by looping in extraneous aspects of the Project, there is no ambiguity that the United States proposes to substitute South Nash Street for the Southgate Parcel. *See* Pl. Mem. 26-27. But at no point did Arlington County agree to accept South Nash Street as a substitute facility or waive its entitlement to fair market value.

In fact, the County repeatedly stated the opposite. Ex. 1 (Schwartz Decl.) ¶¶ 8, 10. For example, the County's comments a year ago on the United States' environmental review for the Project under the National Environmental Policy Act ("NEPA") expressed that "[t]he County continues to stress the need for payment of just compensation to the County for the Army's taking of Southgate Road." *Id.* ¶ 11 and attached Ex. A. In a subsequent memorandum, attached as Schedule I to Plaintiff's Complaint, the County made clear that "[t]he County rejects the notion that Nash Street is a replacement facility for the Southgate Road right of way, and that the issue of just compensation for this right of way remains an outstanding issue that, unless resolved in a mutually agreed manner, will require judicial resolution." ECF No. 1-11, ¶ 2. None of the declarations or documents appended to Plaintiff's Motion proves otherwise.

### C. Before Its About-Face, the United States Took a Position Consistent with the County on the Value of the Southgate Parcel.

Previously, the United States similarly recognized the Southgate Parcel's value beyond the existing roadway. Beginning around 2007, the parties explored an agreement involving the County-owned Southgate Parcel and federal property where the Navy Annex was located, to enable Cemetery expansion on the former. Ex. 3 (O'Hora Decl.) ¶ 3; Ex. 2 (Leach Decl.) ¶ 2. In

September 2008, the County and the federal government approved an agreement which provided

for the exchange of 4.5 acres of County-owned property (approximately the Southgate Parcel)

for 4.5 acres of federally-owned property. Ex. 2 (Leach Decl.) ¶¶ 3-4 and attached Exs. A & B.

In April 2012, the federal government terminated the agreement after the Navy Annex was

administratively transferred to the Army. Ex. 2 (Leach Decl.) ¶ 6; *see also Programmatic*

*Environmental Assessment for Arlington National Cemetery Real Property Master Plan*, Ch. 1 at

1-3 (December 2014).[7]

Thereafter, the Army offered the County a broader land exchange and road realignment

agreement in which the County would receive a greater amount of land on the south side of

Columbia Pike in exchange for the Southgate Parcel. Ex. 2 (Leach Decl.) ¶ 7. As Plaintiff's

own declarant points out, in 2013 the County and the Department of the Army entered into a

Memorandum of Understanding for this revised land exchange. *See* Buller Decl. 5 n.1, ECF No.

49-2; *see also* Buller Decl. Ex. A, ECF No. 49-3; Ex. 2 (Leach Decl.) ¶ 8 and attached Exs. C &

D. The land exchange was never consummated, however, due to the United States'

determination to maximize the Cemetery expansion area by conveying no surrounding land to

the County. *See* Buller Decl. 5 n.1; Ex. 2 (Leach Decl.) ¶ 11. Instead, the United States

proceeded to pursue a straight acquisition. Ex. 1 (Schwartz Decl.) ¶ 4. After the United States

failed to offer a single dollar to purchase the Southgate Parcel, it instituted the present

condemnation proceeding for all County-owned property within the entire Project area.

---

[7]https://www.ncpc.gov/files/projects/Draft_Arlington_National_Cemetery_Real_Property_Master_Plan_Environmental_Assessment_MP45_Apr2015.pdf

### D. South Nash Street Is an Amenity for the United States, Not "Double Compensation" for the County.

The Motion particularly mischaracterizes the genesis and purpose of South Nash Street, which has always been to serve the *United States'* interest in maintaining Base access. The Base is located only about 1.5 miles from the Pentagon, and hosts resident commands of multiple military branches.[8] Many of the Pentagon's service functions are located on the Base such as day care, lodging, and a post exchange. Ex. 2 (Leach Decl.) ¶ 4. There is a high level of traffic between the Base and the Pentagon, including large truck traffic. *Id.* As the United States has found, "Southgate Road is a county-owned, minor arterial primarily used by employees and service vehicles to [the Base], but also provides vehicular circulation for the three residential streets – Orme, Ode, and Oak." 2019 EA, Ch. 3 at 3-41. Based on traffic counts conducted by the County, Southgate Road has typically carried over 3,000 vehicles on an average weekday, much of it Base-related. Ex. 2 (Leach Decl.) ¶ 4. The southern end of the Base has two entrance gates accessible by Southgate Road that are located approximately 600 feet apart. *See* 2019 EA, Ch. 3. at 3-41; Ex. 3 (O'Hora Decl.) ¶ 7 and attached Ex. A.

The County originally proposed to close entry to the Base along the current Southgate Road once the United States takes it for the Project. Ex. 3 (O'Hora Decl.) ¶ 8; Ex. 2 (Leach Decl.) ¶ 5. Without Southgate Road, the existing road network is inadequate to meet the heavy Base-related traffic demands. Ex. 2 (Leach Decl.) ¶¶ 4-5. Specifically, the three north-south streets within the Foxcroft Heights residential community are narrow with parking on both sides, and already burdened with substantial traffic. *Id.* ¶ 4. The United States rejected this proposal. Ex. 3 (O'Hora Decl.) ¶ 8; Ex. 2 (Leach Decl.) ¶ 5. Instead, the parties agreed on construction of a new two-lane defense access road—later labeled South Nash Street—immediately to the east

---

[8] *See* https://home.army.mil/jbmhh/index.php/about.

of Foxcroft Heights to divert the daily flow of traffic between the south gate of the Base and the

Pentagon. Ex. 3 (O'Hora Decl.) ¶ 8; Ex. 2 (Leach Decl.) ¶ 5. The County would manage and

operate the 1.13-acre South Nash Street right-of-way via an easement (the United States did not

offer fee title). The County regarded the defense access road as a mitigation strategy needed to

serve Base interests and of no utility to the County. Ex. 1 (Schwartz Decl.) ¶ 8; Ex. 2 (Leach

Decl.) ¶ 4; Ex. 3 (O'Hora Decl.) ¶ 8. That is, its bypassing of Foxcroft Heights addressed an

adverse effect otherwise created by the Project itself. The County never offered to fund the

design or construction of what the United States' plans now denote as South Nash Street apart

from an agreement whereby the County concurrently would receive federal land as valuable

consideration.[9] More importantly, the United States sought funding through the Defense Access

Roads Program for this road deemed essential for the United States. *See* 23 C.F.R. 660.551. The

United States' pivot on South Nash Street from a federal amenity and mitigation measure to just

compensation is nonsensical.

## ARGUMENT

## I.     THE UNITED STATES HAS NOT FILED A PROPER RULE 71.1(H) MOTION.

As far as the County can discern, the United States' Motion is unprecedented. The

Motion cites not a single case involving—much less granting—a similar Rule 71.1(h) motion to

preclude all discovery and consideration of fair market value for the taken property. That is

---

[9] Plaintiff's submitted Buller Declaration in a footnote also wrongly implies that the County is reneging on $10 million in transportation funding toward the Project. ECF No. 49-2, at 5 n.1. But as the Declaration recognizes, this proposal was made in the context of the overall contemplated land exchange. *Id.* Specifically, the County proposed to apply $10 million in transportation funding which had been awarded to the County by the Northern Virginia Transportation Authority ("NVTA") for the County's previously proposed work on the East End of Columbia Pike (geographically defined as the area between the interchange with Washington Boulevard to the west and the intersection with South Joyce Street). Ex. 2 (Leach Decl.) ¶ 10 and attached Ex. E. But there was no final land exchange deal. *Id.* ¶ 11.

unsurprising given the fundamental disconnect between the relief the Motion seeks and basic principles of federal condemnation proceedings to determine just compensation for a taking.

The United States argues that its Motion presents "preliminary matters," but that is plainly untrue. *See* Pl. Mem. 1. After filing its Motion, the United States concurred that it is a dispositive motion. *See* County's Consent Mot. for Extension 1, ECF No. 52. More specifically, and despite the Motion's disavowal, it is a motion for summary judgment on the merits of this case. *See* Pl. Mem. 21. If the Motion were granted, this case effectively would be over before it begins. The only issue presented, as has always been the sticking point between the parties, is what just compensation the United States owes the County for taking the Southgate Parcel. *See id.* at 15 (recognizing that "the determination of just compensation" is "the sole issue in this case"). Excluding upfront all considerations of fair market value would leave the County with no means to prove the amount of just compensation it is owed. The Motion's suggestion that the County may continue to litigate the "adequacy of the substitute facilities" is a distraction. *Id.* at 20-21. No alteration of South Nash Street or another "facility" would "make Arlington County whole" for the taken Southgate Parcel because that property is more than just a road. *See id.*

The Motion cites nothing to suggest that Rule 71.1(h) authorizes its preemptive strike. That Rule expressly states that the Court does *not* try issues "when compensation must be determined . . . by a jury when a party demands one within the time to answer or within any additional time the court sets, unless the court appoints a commission." Fed. R. Civ. P. 71.1(h)(1). The County in its Answer timely demanded a jury trial on just compensation for the United States' taking of the Southgate Parcel then-owned by the County. *See* ECF No. 42, at 11. And to date, the Court has not appointed a three-person commission. *See* Fed. R. Civ. P. 71.1(h)(2). The inapposite cases cited in the Motion involve truly preliminary matters, namely

the "scope-of-the-project" issue involving whether a later-condemned property was within a federal project's original scope. *See* Pl. Mem. 1 n.1. None of those cases found on a 71.1(h) motion that all evidence of "fair market value has no relevance to this proceeding," as the present Motion is entitled. *See id.* at 1. Even more to the point, these decisions on preliminary issues occurred *after* discovery. For example, in *United States v. Reynolds*, the court decided the "scope-of-the-project" issue after a full jury *trial*.[10] 397 U.S. 14, 15 (1970). Likewise, in *United States v. 1.604 Acres of Land*, this Court decided the same issue and excluded or allowed certain valuation evidence based on an extensive developed record, expert appraisals, and witness testimony. 844 F. Supp. 2d 668, 679, 685 (E.D. Va. 2011) ("[a]fter consideration of the evidence in the record and that proposed to be offered at trial"). And in *United States v. 15,478 Square Feet of Land*, this Court heard a 71.1(h) motion four weeks before a scheduled jury trial, and held that "each party will be permitted to put on its opinions of highest and best use at trial." No. 10-322, 2011 WL 2471586, at *1, 10 (E.D. Va. June 20, 2011).

Further, when properly construed as a motion for summary judgment, the Motion fails to conform to the applicable requirements. The United States bears the burden to demonstrate that there is no genuine issue of material fact and it is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). "The evidence of

---

[10] The *Reynolds* case also pre-dated the current text of current Rule 71.1(h). *Compare* Fed. R. Civ. P. 71.1(h)(1) *with Reynolds*, 397 U.S. at 19 n.12 (quoting "full text" of then-Fed. R. Civ. P. 71A(h)). But even prior Rule 71A was intended generally "to give a right to jury trial," and "subdivision (h) establishes that method as the general one for determining the issue of just compensation." Fed. R. Civ. P. 71.1 Comments, *Advisory Committee Original Report* (1951); *see also United States v. Werner*, 36 F.3d 1095, at *3 (4th Cir. 1994) (per curiam) ("In the context of a condemnation action, Rule 71A(h) provides that the issue of compensation is determined in a trial by jury, 'unless the court in its discretion orders that, because of the character, location, or quantity of the property to be condemned, or for other reasons in the interest of justice, the issue of compensation shall be determined by a commission of three persons appointed by it.'").

the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).[11] "As a general proposition, 'summary judgment is appropriate only after adequate time for discovery.'" *Greater Balt. Ctr. for Pregnancy Concerns, Inc. v. Mayor & City Council of Balt.*, 721 F.3d 264, 280 (4th Cir. 2013) (citation omitted) (reversing district court merits ruling that denied defendants essential discovery).

Here, the Motion does not even purport to satisfy the United States' burden to dispose of this case. It omits a listing of undisputed facts in numbered-paragraph form as required under Local Civ. R. 56(B) and the Court's Rule 16(b) Order, ¶ 9(f), ECF No. 48. *See also* Fed. R. Civ. P. 56(c)(1)(A). To the extent the Motion argues that it leaves open salient issues, it also contravenes the Court's prohibition of partial summary judgment motions without prior leave of Court. R. 16(b) Order, ¶ 9(f), ECF No. 48; Local Civ. R. 56(C). Finally, as further explained below, the Motion fatally assumes the fact that the Southgate Parcel has determinable market value. *See* Pl. Mem. 16 n.9.

---

[11] This standard would be the same if Plaintiff's Motion were construed instead as a Rule 12(c) motion for judgment on the pleadings (which also would require exclusion of its declarations). Fed. R. Civ. P. 12(c); *Greensill Capital (Uk) Ltd. v. Tempus Intermediate Holdings, LLC*, No. 4:17-cv-127, 2018 WL 1937063, at *2 (E.D. Va. Apr. 24, 2018) ("In the Fourth Circuit, when resolving a Rule 12(c) motion on the basis of the underlying merits, as is the current posture, the Court decides such motion under the same standard as a motion for summary judgment. Thus, the Court 'assumes the facts alleged by the nonmoving party to be true and draws all reasonable factual inferences in its favor, and judgment is appropriate only if the moving party establishes that no genuine issue of material fact remains to be resolved and that the party is entitled to judgment as a matter of law.'") (citation omitted); *see also Hous. Auth. Risk Retention Grp., Inc. v. Chicago Hous. Auth.*, 378 F.3d 596, 600 (7th Cir. 2004) ("Where the plaintiff moves for judgment on the pleadings, 'the motion should not be granted unless it appears beyond doubt that the non-moving party cannot prove facts sufficient to support his position.'") (citation omitted).

## II. THE UNITED STATES CANNOT INVOKE THE SUBSTITUTE FACILITIES DOCTRINE TO AVOID PAYING FAIR MARKET VALUE TO THE COUNTY.

The United States contends that invoking "substitute facilities" enables it to single-handedly render fair market value irrelevant in a condemnation proceeding.  *E.g.*, Pl. Mem. 3.  The Motion cites no authority for this novel proposition.  That is because a prerequisite for the substitute facilities doctrine is that fair market value would not yield just compensation.  Thus, there can be no judgment on application of substitute facilities doctrine without first inquiring as to fair market value—which in turn entails discovery and fact-finding (as the parties are currently doing).  Further, the United States is attempting to use this inapplicable doctrine unilaterally, thereby disregarding not only the position of the County, but also the precise purpose of the doctrine, which is to protect the rights of the owner whose property is taken.

Just compensation begins with fair market value.  The Constitution guarantees that "nor shall private property be taken for public use without just compensation."  U.S. Const. amend. V.  As the United States concedes, just compensation is typically "achieved by the government paying the fair market value of the property on the date of taking—*i.e.*, 'what a willing buyer would pay in cash to a willing seller.'"  Pl. Mem. 16 (citing *United States v. Miller*, 317 U.S. 369, 374 (1943)); *see also Miller*, 317 U.S. at 373 ("Such compensation means the full and perfect equivalent in money of the property taken."); *Kirby Forest*, 467 U.S. at 10 (just compensation "means in most cases the fair market value of the property on the date it is appropriated").  Moreover, "'just compensation' is not limited to the value of the property as presently used, but includes any additional market value it may command because of the prospects for developing it to the 'highest and best use' for which it is suitable."  *United States v. 320.0 Acres of Land, More or Less in Monroe Cty.*, 605 F.2d 762, 781 (5th Cir. 1979); *see also id.* (citing *Olson v. United States*, 292 U.S. 246, 255 (1934) for the same point).  "Other

measures of 'just compensation' are employed only 'when market value [is] too difficult to find, or when its application would result in manifest injustice to owner or public . . . .'" *Kirby Forest*, 467 U.S. at 10 n.14 (citation omitted).

The United States overstates that "the Supreme Court and numerous lower courts have recognized that the United States may provide just compensation in the form of substitute facilities." Pl. Mem. 17. In fact, the Supreme Court has unanimously criticized the "substitute facility doctrine" as an unfair measure of compensation. Consistent with the above, the "substitute facilities doctrine" is a narrow exception that protects the *owner whose property is being taken* because the property's market value either is indeterminable or insufficient. The substitute facilities doctrine is not a license for the United States to summarily dispense with fair market value considerations at the outset of a case, particularly over the condemnee's objection.

The *Duncanville* case, on which the United States chiefly relies, illustrates the point. *See* Pl. Mem. 15, 24-25. For starters, that case did not involve a Rule 71.1(h) motion, but followed a trial where "both parties submitted evidence on the fair market value of the condemned property and on the cost of the substitute landfill facility." *United States v. 50 Acres of Land* ("*Duncanville*"), 469 U.S. 24, 27 (1984). Moreover, the Supreme Court unanimously *rejected* application of the substitute facilities doctrine in lieu of fair market value. *Id.* at 29. Instead, the Supreme Court began by reiterating the seminal importance of fair market value. *Id.* at 30. It concluded that "[i]n this case, as in most, the market measure of compensation achieves a fair 'balance between the public's need and the claimant's loss.'" *Id.* at 33 (citation omitted). In contrast, the Supreme Court reasoned that the substitute facilities approach would "add uncertainty and complexity to the valuation proceeding without any necessary improvement in the process," and "diverges from the principle that just compensation must be measured by an

objective standard that disregards subjective values which are only of significance to an individual owner." *Id.* at 35. Consistently, the concurring opinion observed that substitute facilities may be available where "a municipality or other local governmental entity . . . establish[es] that payment of market value in a particular case is manifestly unjust." *Id.* at 37.

The United States misreads *Duncanville* and *Brown v. United States*, 263 U.S. 78 (1923) to endorse its theory that "the United States chooses the method of compensation." Pl. Mem. 25. They say no such thing. Specifically, the Motion quotes dicta in *Duncanville* merely construing other dicta in *Brown*: "*Brown* merely indicates that it would have been constitutionally permissible for the Federal Government to provide the city with a substitute landfill site instead of compensating it in cash." *Duncanville*, 469 U.S. at 33. The Motion fails to mention that *Duncanville* found the very derivation for the substitute facilities doctrine suspect because *Brown* addressed the United States' condemnation authority, rather than the proper measure of just compensation. *Id.* at 31-33. Moreover, the Motion omits the very next sentence in *Duncanville*, which demonstrates just compensation's proper grounding in fair market value. *Id.* at 33 ("Nothing in *Brown* implies that the Federal Government has a duty to provide the city with anything more than the fair market value of the condemned property."). The Court thus did not endorse the United States' novel idea that it can use the substitute facilities doctrine offensively to nullify fair market value, thereby denying the condemnee the opportunity to fully establish the factual record for trial.

The United States also contends that the present case is the "paradigmatic" or "classic substitute facilities case" because it involves "acquisition of public roads." Pl. Mem. 18. As discussed above, the Southgate Parcel—unlike Columbia Pike or the South Joyce Street easement—is not just a public road but highly valuable property for residential development. In

any event, there is no rule that public roads automatically trigger the substitute facilities doctrine. Even the United States' own seminal standards for federal real estate acquisitions (the "Yellow Book") specify that "compensation for streets, highways, roads, alleys, other infrastructure, or public facilities is measured by the same market value standard applied to other types of property, whether publicly or privately owned."[12] The Motion offers no defense for the United States' failure to follow its own promulgated standards for all federal agencies using eminent domain authority, no authority for its failure to determine fair market value at the outset, and no authority for disregarding the County's position on a fair market value determination.

The United States also cites no case, even involving public roads or other facilities, unilaterally seeking the same relief as its present Motion. For example, in *Town of Clarksville v. United States*, the Fourth Circuit observed that "[t]he taking may be justly compensated by payment of the cost of a substitute, *so long as a full equivalent is afforded for the property taken*." 198 F.2d 238, 242 (4th Cir. 1952) (emphasis added). But there "the parties stipulated that just compensation should be paid by a substitute facility" for a taken sewer system. *Id.* Similarly, the parties were "in accord" with application of the substitute facilities doctrine in *United States v. Streets, Alleys and Public Ways in Stoutsville*, 531 F.2d 882, 885 (8th Cir. 1976). The same was true in *United States v. 10.56 Acres, more or less, in Whatcom Cty.*, where "the United States 'avoided' paying fair market value only because the State conceded that the

---

[12] *Uniform Appraisal Standards for Federal Land Acquisitions*, U.S. Dept. of Justice, 195-96 (2016), https://www.justice.gov/file/408306/download. Principally organized and prepared by the U.S. Department of Justice under the auspices of the Interagency Land Acquisition Conference, the Yellow Book establishes uniform standards for "valuation of real estate in federal acquisitions." *Id.* at 1 (foreword by Chair J. Cruden). It establishes "twin aims" of not only providing for the United States' interest but also "ensuring fair and equitable treatment of landowners whose property is affected by public projects." *Id.* The United States in this case has overlooked the second prong.

substitute facilities doctrine applied." No. C07-1261, 2010 WL 415244, at *2 (W.D. Wash. Jan. 27, 2010); *see also id.* ("Nothing compelled the parties to concede that the substitute facilities doctrine applies in this case, but they are now bound by their concession. One consequence of their choice is that the market value of the condemned property is no longer relevant.").[13] Thus, fair market value remains relevant here.

## III. THE UNITED STATES FAILS TO PROVE AN ABSENCE OF DISPUTED ISSUES OF MATERIAL FACT REGARDING JUST COMPENSATION.

For present purposes, it suffices to defeat Plaintiff's Motion that the United States does not even counter the Southgate Parcel's fair market value. Regardless, as explained above, there are many material facts that bear upon fair market value. Discovery on those facts is ongoing, with a mandatory completion date of January 15, 2021.

Ostensibly, the United States might end up disagreeing with the County's determination of the amount of fair market value. Or maybe it will agree, and the parties could reach a negotiated resolution of this case. But these factual issues of just compensation depend on expert appraisals, witness testimony, and other evidence, and should be decided by a jury as the trier of fact. The United States cannot ordain all salient facts via declarations supporting a motion to foreclose factual development. To date, the United States has not even shared an appraisal, if it has even prepared one at all. The Motion instead suggests in a passing footnote, without any support, that "the cost to construct substitute roads presumably far exceeds any market value." Pl. Mem. 24 n.13. Therefore, based on the current record, the Motion must fail.

---

[13] Moreover, as to the United States avoiding payment beyond its proffered substitute facility, "[t]here is no reason for the court to interpret the silence of litigants in decades-old cases as favoring the United States' position." *United States v. 10.56 Acres, more or less, in Whatcom Cty.*, No. C07-1261, 2008 WL 3977614, at *5 (W.D. Wash. Aug. 22, 2008); *see also id.* at *4, 6 (distinguishing other cases cited in the United States' Motion, and finding that "just compensation may include a monetary award in addition to the substitute facility.").

The United States' accusation that the County is seeking "double compensation" or a "windfall" crumbles when viewing South Nash Street for what it really is—a benefit to the United States rather than a "substitute facility" being provided to the County. As discussed above, this new federal defense access road is only necessary to replace the Base's lost gate access to the County public road system due to the Project closing Southgate Road. The County proposed closing the Base's access at Southgate Road as a result of the Project, but the United States insisted on maintaining access. Thus, the new defense access road is a required new federal facility. For that reason, the Court should accord no weight to the Motion's empty speculation that the United States would abandon South Nash Street as part of the Project if it had to pay the County the fair market value of the Southgate Parcel. The only purported benefit to the County is mitigation of increased traffic in Foxcroft Heights, an adverse effect that the Project itself would create.

As the Motion repeatedly states, the County must be "made whole." But a defense access road and ten dollars does not confer that result for the Southgate Parcel taken from the County. The Unites States' position is tantamount to allowing the condemnor (the United States) to compensate itself, rather than the condemnee (Arlington County), for the taking of the condemnee's property. Ordering that result, especially on a nascent factual record, would be "manifest injustice" to the County and its residents. *See Kirby Forest*, 467 U.S. at 10 n.14.

## CONCLUSION

Having brought this condemnation action, the United States evidently disagrees with the County on what constitutes just compensation. But that just makes this case like any other condemnation case. The United States cannot begin the case by jettisoning the prevailing fair market value standard simply because the United States prefers not to pay fair market value. For the foregoing reasons, Plaintiff's Motion should be denied.

21

Dated: September 25, 2020

Respectfully Submitted,

/s/ Stephen A. MacIsaac

Stephen A. MacIsaac (Bar No. 21130)
Arlington County Attorney
MinhChau N. Corr (Bar No. 78877)
Deputy County Attorney
2100 Clarendon Boulevard, Suite 403
Arlington, Virginia 22201
Phone: 703-228-3100
Fax:    703-228-7106
Email:  smacisaac@arlingtonva.us
        mcorr@arlingtonva.us

John C. Cruden (admitted *pro hac vice*)
Gus B. Bauman (admitted *pro hac vice*)
James M. Auslander (admitted *pro hac vice*)
Beveridge & Diamond, P.C.
1350 I St., N.W.
Washington, DC 20005
Phone: 202-789-6009
Fax:    202-789-6190
Email:  jcruden@bdlaw.com
        gbauman@bdlaw.com
        jauslander@bdlaw.com

*Attorneys for Defendant*
*Arlington County, Virginia*

## CERTIFICATE OF SERVICE

I hereby certify that on the 25th day of September, 2020, a true copy of the foregoing Arlington County's Response to Plaintiff's Rule 71.1 Motion to Determine that Fair Market Value Has No Relevance to This Proceeding was served via the Court's CM/ECF system on all counsel of record as listed below:

Eugene N. Hansen
Environment & Natural Resources Div.
U.S. Department of Justice
P.O. Box 7611 – Ben Franklin Station
Washington, D.C. 20044
eugene.hansen@usdoj.gov

Melissa Baker
Environment & Natural Resources Div.
U.S. Department of Justice
P.O. Box 7611 – Ben Franklin Station
Washington, D.C. 20044
melissa.baker@usdoj.gov

Kristin Starr
Assistant United States Attorney
2100 Jamieson Ave.
Alexandria, VA 22314-570
Kristin.Starr@usdoj.gov

*Counsel for Plaintiff United States*

Robert Gastner
Jessica Glajch
Eckert Seamans Cherin & Mellott, LLC
1717 Pennsylvania Ave. NW, 12th Floor
Washington, DC 2006
*Attorneys for Defendant FiberLight LLC*

Samuel J. Banks
Bean Kinney & Korman
2311 Wilson Blvd, Ste. 500
Arlington, VA 22201
*Attorneys for Defendant Jones Utilities
Construction*

Godfrey T. Pinn, Jr.
Harrell & Chambliss LLP
Eighth and Main Building
707 East Main Street, Suite 1000
Richmond, VA 23219
*Attorneys for Defendants Dominion
Virginia Power and Washington Gas*

Richard D. Holzheimer, Jr.
Brooks H. Spears
Anastasia P. Cordova
Keith J. Minson
McGuire Woods LLP
1750 Tysons Blvd, Ste. 1800
Tysons, VA 22102
*Attorneys for Defendants Verizon*

Dated: September 25, 2020

/s/ Stephen A. MacIsaac
Stephen A. MacIsaac