IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

UNITED STATES OF AMERICA, )
                              )
          Plaintiff, )
                              )
     v. )          1:20-cv-667 (LMB/JFA)
                              )
8.929 ACRES OF LAND IN ARLINGTON )
   COUNTY, VIRGINIA, et al., )
                              )
        Defendants. )

## MEMORANDUM OPINION

This civil action arises out of the taking of 8.929 acres of land by the plaintiff, the United States of America ("plaintiff" or "Government"), from the defendant, Arlington County, Virginia ("defendant" or "County"), to expand Arlington National Cemetery ("Cemetery"). The parties came before the Court for a bench trial to determine whether 4.23 acres of that land, which consists of Southgate Road and adjoining land (the "Southgate Road Parcel"), is severable from the entire 8.929-acre parcel, and, if so, whether the County is entitled to monetary compensation for the taking of the Southgate Road Parcel. For the reasons that follow, the Court finds that the Southgate Road Parcel is not severable from the larger parcel; therefore, the Court will grant judgment in favor of the Government. Moreover, because the County has conceded that if the Southgate Road Parcel is not severable, the substitute facilities offered by the Government constitute "just compensation" for the taking[1] and no jury trial will be required.

---

[1] See U.S. Const. amend. V ("[N]or shall private property be taken for public use, without just compensation.").

## I. BACKGROUND

On March 9, 2021, the Court granted the Government's Motion for Summary Judgment after concluding that the Southgate Road Parcel was not severable from the 8.929 acres. [Dkt. No. 119]. The County appealed that judgment to the United States Court of Appeals for the Fourth Circuit, which reversed the grant of summary judgment after finding that genuine disputes of material fact existed. See United States v. 8.929 Acres of Land in Arlington Cnty., Va., 36 F. 4th 240, 266–67 (4th Cir. 2022). Although the Fourth Circuit acknowledged that in eminent domain actions governed by Fed. R. Civ. P. 71.1 the court is the trier of fact on most issues, it nevertheless remanded the action "so that the district court may resolve the genuine disputes of material fact pursuant to its authority under Rule 71.1," rather than at the summary judgment stage. 8.929 Acres, 36 F.4th at 267. The parties appeared for a two-day bench trial, from which the Court makes the following findings of fact and conclusions of law.

## II. FACTUAL FINDINGS

The Government filed this Complaint in Condemnation on June 15, 2020, against the County and several other entities.[2] All known entities, other than the County, eventually disclaimed their interests in the 8.929 acres, and no additional entities have claimed an interest in the condemned property. [Dkt. No. 98], Stipulation of Uncontested Facts ("SUF") at ¶¶ 2–7. The United States condemned the 8.929 acres on June 24, 2020 (the "date of the taking"), in order to expand Arlington National Cemetery. Id. at ¶ 8, 18. The 8.929 acres consist of portions of three roads previously owned by the County: Columbia Pike, South Joyce Street, and

---

[2] These entities included FiberLight, LLC; Verizon Business Network Services, Inc.; Washington Gas; Verizon Virginia, LLC; Jones Utilities Construction, Inc.; and Dominion Virginia Power, all of which had various utilities on the 8.929 acres. The seventh entity was listed as "other unknown owners" of the 8.929 acres.

Southgate Road, as well as a median strip and part of a parking lot adjacent to Southgate Road. Id. at ¶ 9.

### A. **History of the Project and the Taking**

In 1999, to ensure that the Cemetery would remain an active military cemetery to accommodate deceased military members and their families, Congress authorized an expansion project that would eventually become the Arlington National Cemetery Southern Expansion Project (the "ANCSE Project") and the Defense Access Roads Project (the "DAR Project") (collectively, the "Project"). Id. at ¶ 14.[3]  When complete, the Project will incorporate federal property into the Cemetery, including the former Navy Annex and the Air Force Memorial, as well as the condemned roads and land at issue in this civil action, expanding the Cemetery by a total of 49 acres, and adding enough space for an additional 60,000 internments and inurnments. Id. at ¶¶ 16–17.  The bright outline in Figure 1 depicts the Project area, showing the existing roadways, including Southgate Road, South Joyce Street, and Columbia Pike, which will either be eliminated or rerouted when the Project is completed.  It also shows just to the left of the yellow line a portion of the Foxcroft Heights residential community which consists of approximately 95 homes, ranging from modest single-family houses and townhouses to two 16-unit apartment buildings.  The narrow streets in Foxcroft Heights, two of which are one-way, run from Columbia Pike into the neighborhood.

The taking at issue consists of 8.929 acres, 4.23 acres of which constitute the Southgate Road Parcel, which contains Southgate Road and an adjoining parking lot and grassy area, and the rest consisting of a portion of Columbia Pike and South Joyce Street.  Since 1990, Southgate

---

[3] The parties agree that, without expansion, the Cemetery is estimated to reach burial capacity by the 2040s.  SUF at ¶ 13.

Road has been a public roadway, used by motorists and trucks to reach the South Gate of Joint

Base Myer-Henderson Hall (the "Base").  It has also served as one of the County's official bike

routes.  Approximately 3,500 to 4,000 vehicles traffic Southgate Road each weekday, primarily

to get to and from the Base and the Pentagon.

**Figure 1**



Plaintiff's Exhibit ("PX") 25.

The parties have stipulated and the Court finds that the Project will: 1) realign Columbia

Pike by removing its very dramatic curve and shortening South Joyce Street, 2) eliminate most of

Southgate Road and portions of South Joyce Street (and incorporate this land into the Cemetery),

3) add a new two-lane South Nash Street to the side of the Foxcroft Heights community adjacent

to the expanded Cemetery; 4) provide new on and off-ramps from Washington Boulevard to the

redesigned Columbia Pike, and 5) relocate the Cemetery's operations complex to south of the

4

realigned Columbia Pike (near I-395).  SUF at ¶ 19.  Figure 2 shows the proposed changes to the

roadways in the area, with the removed areas depicted in thatch marks and the realigned

roadways and the new South Nash Street shown in bright white.

**Figure 2**



PX 76.

Before the taking, the County owned the relevant portions of Southgate Road and

Columbia Pike in fee simple and held an easement over South Joyce Street.  SUF at ¶¶ 10–11.

To compensate the County for condemning these areas, the Government has offered substitute

facilities that include a significantly realigned and redesigned Columbia Pike, a shortened South

Joyce Street, and a newly built two-lane South Nash Street, separating the Foxcroft Heights

neighborhood from the Cemetery and providing better access to the neighborhood.  PX 76; PX

20.  The Project proposes to redesign Columbia Pike by reducing its significant curvature,

widening vehicle travel lanes to allow for dedicated bus lanes, providing pedestrian sidewalks on

both sides of the roadway, and adding a 10-foot wide segregated bike lane.  PX 20.  Figure 3

shows a cross-section of what Columbia Pike will look like when completed.

**Figure 3**



COLUMBIA PIKE IN THE VICINITY OF AIR FORCE MEMORIAL (Looking East)

PX 20.

The construction of South Nash Street will provide a two-way street that will permit

continued access to the South Gate of the Base, which Southgate Road currently provides.  The

parties agree that continued access to the Base is necessary.  SUF at ¶ 20.  The County does not

dispute that the improvements to Columbia Pike constitute appropriate substitute facilities

offered by the Government as compensation for the sections of Columbia Pike and South Joyce

Street that have been taken, but it seeks monetary compensation for the taking of the Southgate

Road Parcel.  SUF at ¶ 12.

Before it was taken, Southgate Road consisted of two roadway lanes separated by a

grassy median and provided a route for vehicle traffic driving from the Pentagon to the Navy

Annex, the Base, and Columbia Pike.  SUF at ¶ 25.  The Government conveyed the north, westbound lane of Southgate Road, as well as a section of the median dividing the two lanes, to the County by a deed in 1956, "upon the condition that" the County "will maintain the project constructed thereon."  PX 44; PX 87.  In accepting the roadway, the County agreed "for itself, its successors and assigns forever, to maintain the project constructed thereon."  Id.

By a 1963 deed, the Government conveyed to the County the south, eastbound lane of Southgate Road, as well as the remainder of the median dividing the two roadways and a portion of the parking lot in the southeast section of the Southgate Road Parcel.  PX 42; PX 87.  The 1963 deed stated that the Government conveyed the land to the County pursuant to 40 U.S.C. § 345c, which, at the time, permitted the Government to convey land to a political subdivision of a state for the purpose of "widening . . . a public highway, street, or alley."  PX 42; PX 43.  The total area conveyed to the County in these two deeds was 4.23 acres.  SUF at ¶ 28.  Finally, in 1995, the Commonwealth of Virginia conveyed a quitclaim deed of easement to the Government over the eastbound lane of Southgate Road for security enforcement and parking.  PX 41.[4]  The federal Government has relied on this easement to control security and enforce parking restrictions along the eastbound lane of Southgate Road and the attached parking lot since 1995.

Figures 1 and 2 make clear that the expansion of the Cemetery within the Project area requires taking Southgate Road, which runs adjacent to the Cemetery's southern wall.  As early as 2007, the Government and the County began negotiating the transfer of the Southgate Road Parcel to the Government for the Cemetery expansion.  Initially, the parties discussed a land

---

[4] The County contests the validity of this conveyance.  The Byrd Road Act of 1932 made it possible for the Commonwealth to take over local county roads and maintain them; however, counties could opt out of this statute and maintain ownership of their local roads.  The County was one of only two Virginia counties to opt out, and, as such, it maintains ownership over its local roads.

exchange. Specifically, in 2008, the County entered into a preliminary agreement with the Washington Headquarters Service ("WHS"), a division within the Department of Defense, to exchange the 4.23-acre Southgate Road Parcel for an equal amount of acreage that had been used for the former Navy Annex. Defense Exhibit ("DX") 5. This agreement did not include a substitute road that would access the Base. Id. The County planned to use the land within the former Navy Annex area to build a museum commemorating the Freedman's Village, an encampment for formerly enslaved persons that was created by the federal Government during the Civil War.[5] PX 54.

The 2008 agreement was never finalized. In 2012, ownership of the federal land formerly occupied by the Navy Annex was transferred from WHS to the Department of the Army, and the Government subsequently reneged on the proposed agreement to transfer land from the former Navy Annex property to the County. PX 22. The Army continued land exchange negotiations with the County, but no longer offered to exchange the land contained in the former Navy Annex because the Cemetery expansion plans were expanded to include the entire area formerly occupied by the Navy Annex. After continued negotiations, the Government and the County signed a Memorandum of Understanding in 2013 (the "MOU"), which proposed realigning Columbia Pike and constructing a new Base access road, the

---

[5] This exchange was authorized by the 2005 National Defense Authorization Act ("NDAA"), passed on October 24, 2004. PX 106. The 2005 NDAA granted the United States a reversionary interest in the property should the County not use the property for the purposes stated in the NDAA, which were "the construction of a freedmen heritage museum and an Arlington history museum." Id. Were the United States to exercise this reversionary interest, the Secretary of Defense would have been required to pay the County the amount of the fair market value of the land, as determined by the Secretary. Id. The 2005 NDAA also authorized the Secretary of Defense to select the specific land within the former Navy Annex area to be exchanged with the County. Congress stated that, in selecting this land, the Secretary "shall seek," inter alia, "to preserve the appropriate traditions of Arlington National Cemetery." PX 106.

placement of which would mirror the currently-proposed South Nash Street.  Some County
documents labelled that new road as a "Realigned Southgate Road."[6]  PX 22.  In the 2013 MOU,
the County agreed to bear all of the costs of construction and maintenance of that new Base
access road.  Id.  Under this agreement, the Army offered a parcel of land to the County just
south of the realigned Columbia Pike in exchange for the Southgate Road Parcel and the portions
of Columbia Pike incorporated into the Cemetery land.  Id.  After signing the 2013 MOU, the
County paid more than $300,000 for a report detailing an "alternatives evaluation," utility
studies, and interchange modification issues of the roadways, and the County discussed
allocating $10 million in transportation grant funds to improve Columbia Pike in the Project
area.

　　In a 2015 written proposal for roadway realignment, the County referenced a $10 million
grant from the Northern Virginia Transportation Authority ("NVTA"), stating that "[t]his
funding represents all funding required by the County for engineering, design and construction of
the realigned Columbia Pike."  PX 122.  This $10 million contributed by the County was in
addition to the $30 million that the Government would provide for the project, bringing the total
funding of the project contemplated in the 2015 proposal to $40 million.  Id.  This same 2015
proposal identified the goals of the roadway realignment.  The new Columbia Pike would
include "a reconstructed four lane roadway with a buffer strip and a 6 foot sidewalk on the south
side of Columbia Pike and a buffer strip with a [10-foot] shared use[] path on the north side."

---

[6] The record reflects that, as early as 2011, the County recognized that if Southgate Road were
no longer available as an access to the Base, a substitute road would have to replace it to avoid
burdening the Foxcroft Heights community with a significant increase in vehicular traffic.  Id.
("The County remains concerned about providing undisrupted vehicular access to [the Base]
throughout this process while also minimizing spill over traffic to and from the [B]ase onto the
local streets of the Foxcroft Heights Neighborhood.").  PX 82.

PX 122.  Although this design does not precisely mirror the current proposed redesign of

Columbia Pike, it represented a significant change from the Columbia Pike that existed in 2015.

PX 164.  Among other improvements, there would be buffers between the shared-use pedestrian

and bike paths.  This realignment of Columbia Pike and South Joyce Street, depicted in the red

outline in Figure 4 below, also includes a new Base access road—South Nash Street—which

connects traffic from the realigned Columbia Pike and South Joyce Street to the Base.  PX 122.

As the County has conceded, these roadway alignments were a compromise position proposed by

the County to ensure that it received "land sufficient to meet [its] stated goals" and that the Army

could "maximize land north of a realigned Columbia Pike."  Id.

**Figure 4**



The 2015 proposal is relevant to the Court's conclusion because it shows that, as of 2015,

the County had no plan for residential development of any of the land at issue and that it was

mindful of ensuring its use of the land respected the land's proximity to the Cemetery.  PX 122.

In fact, the 2015 proposal began with the County's acknowledging its "commitment . . . to not

allow for private ownership of the land" it was to receive and then listed three proposed uses for
the land:

1.  A joint facility with space for the Air Force Association, an
    Arlington County heritage interpretive center and associate parking
    facilities;
2.  open space; or
3.  a county bus maintenance and storage facility on the western end of
    the parcel.

Id. It specifically acknowledged that any bus maintenance or storage facility "would have a

context sensitive design, with walls and vegetative buffers to screen the facility from the

roadway, the surrounding community, and Arlington National Cemetery." Id. The 2015

proposal emphasized that the County would engage in a public process to conceptualize and

design both the Air Force and bus facilities, specifically stating as to the bus facility:

> County staff will coordinate with nearby residents, the general
> public, associations (Air Force Memorial, 911 Memorial) and state
> and federal agencies, including Arlington National Cemetery,
> during the bus facility's design process to provide additional
> information and seek input on design treatments. The design
> treatments, including materials and visual screening, will be
> compatible with the image of both national shrines—Arlington
> National Cemetery and the Air Force Memorial.

Id.

Initially, the Government agreed to the County's proposed roadway realignment and land

exchange, PX 124; however, as Arlington National Cemetery Superintendent Katharine Kelley

("Kelley") testified, around the spring of 2017, the Army decided to remove a land exchange

from the negotiations because Congress had issued new authorization permitting the Army to

negotiate without a land exchange and requiring the Army to negotiate with the goal of maximizing Cemetery burial space.[7]

Even though the County was aware that the Government would no longer offer a land exchange for the Southgate Road Parcel, it continued to express support for the Columbia Pike realignment and the Cemetery expansion project as a whole. See PX 54 (quoting County Manager, Mark Schwartz ("Schwartz"), in a press release as stating that the County was "committed to working with the [C]emetery to support one of our nation's most cherished and hallowed sites"). After the Government decided to withdraw its offer of a land exchange, the County applied the $10 million NVTA grant to improving other portions of Columbia Pike outside the Project area, which meant the Government needed to secure additional funding from Congress to continue working on Columbia Pike in the Project area.

After a land exchange was abandoned, the County and the Government continued to negotiate over the scope of the substitute roads that would be constructed, and over the Columbia Pike redesign. Absent a land exchange, the County insisted on financial compensation for the Southgate Road Parcel, PX 54, and vigorously negotiated the width and overall design of Columbia Pike. As Superintendent Kelley testified, the Army's intent was to minimize the width

---

[7] As Justin Buller ("Buller"), the Army's Assistant General Counsel since 2010, testified, Congress executed this new authorization because "the County wanted to use the property for means that the leadership of the United States Army told me was not acceptable with land adjacent to our nation's most hallowed shrine." Trial Trans. 116:18–21. Of particular concern was the failure of the 2015 NDAA to include the same reversionary clause as was in the 2005 NDAA, which granted the United States a reversionary interest in the property should the County choose to use the land for a purpose not specified in the NDAA. As such, should the County have chosen to use the land for something contrary to the mission of the Cemetery, the Government would not have been able to take immediate possession of the land. This possibility led the Government to take the 8.929 acres through eminent domain and offer the County substitute facilities for the taking of the Southgate Road Parcel and portions of Columbia Pike and South Joyce Street.

of the redesigned Columbia Pike to maximize burial space.  Before the final redesign, the width

of Columbia Pike in the Project area, including sidewalks of about a four-foot width on each

side, was 50 to 65 feet.  PX 164.  After the negotiated final redesign, the County succeeded in

obtaining a redesigned Columbia Pike that will be 88-feet wide and will include two eight-foot

wide sidewalks, one dedicated ten-foot wide bike lane, and landscaping dividing the sidewalks

and bike lanes from the vehicle travel lanes.  PX 20.  This design represented a compromise by

the Government, which initially sought to build mixed-use pedestrian and bike lanes on the

redesigned Columbia Pike, that would have minimized the width of the overall roadway, but the

Government eventually agreed to build a segregated bike path at the County's insistence.[8]  The

current Project, including the realignment and redesign of Columbia Pike, the shortening and

realignment of South Joyce Street, and the construction of South Nash Street, will cost the

Government an expected $60 million.

 Throughout these negotiations, the County recognized the impact closing Southgate Road

would have on traffic.  Not only did the County believe that the newly-constructed South Nash

Street would help accommodate the traffic that could no longer travel on Southgate Road, but it

also treated Columbia Pike's redesign as a mitigation measure for the loss of Southgate Road as

a roadway and bike route.  For example, in a 2017 press release, County Manager Schwartz

called South Nash Street a "Realigned Southgate Road."  Id.  In a 2018 letter to Kelley, Schwartz

---

[8] The County presented evidence that it had intended to redesign the portion of Columbia Pike within the Project area consistent with its plan to redesign the entire Columbia Pike.  DX 65. The eventual design on which the parties agreed mirrored the goals of the County's prior development plans.  Id.  County witnesses testified that the County would have progressed with the development of Columbia Pike in the Project area absent federal intervention; however, the Court finds that would not have been possible without the cooperation of the Government because the Government owned the land on both sides of the roadway, meaning the County would not have been able to widen Columbia Pike without the Government's agreement.

emphasized the role of the new Columbia Pike in accommodating traffic from a closed Southgate

Road, stating:

> While Arlington County fully supports improvements to Columbia
> Pike, these improvements should not be characterized as objectives
> of the proposed expansion.  The roadway improvements are a
> mitigation response to the closure of Southgate Road, a primary
> transportation connection between the Pentagon and Joint Base
> Myer-Henderson Hall.  Expansion of the Cemetery and the closure
> of Southgate Road will force additional traffic on to Columbia Pike
> . . . .

PX 59.  Schwartz reiterated the same belief that the Columbia Pike redesign was a "mitigation

response" to the increased traffic that would result from Southgate Road's closure in another

2018 letter to an Army Corps of Engineers staff member.  PX 60.

Moreover, the County and its Pedestrian Advisory Committee ("PAC") viewed Columbia

Pike's new bike path as a replacement for Southgate Road's previous function as a major bike

route.  In his 2018 letter to the Army Corps of Engineers, Schwartz included a letter from the

PAC, which stated that a 10-foot mixed-use pedestrian and cycling path on Columbia Pike was

insufficient to meet the cycling demands that Columbia Pike would see after the closure of

Southgate Road and would create safety concerns.  PX 60.  The PAC additionally took issue with

the draft environmental assessment ("EA"), stating:

> The EA plan proposes to close most of Southgate Road, which is
> both an official Arlington County bike route and the preferred route
> for most cyclists and many pedestrians heading up and down the
> hill.  The report makes no mention of the impact of the loss of
> Southgate Road to cyclists and pedestrians—which severs "an
> existing major route for bicycles or pedestrians."

PX 60.

On March 19, 2020, Schwartz recommended that the County Board adopt a resolution

endorsing the major design elements of the Project, and, on April 25, 2020, the County Board

adopted his recommendation for the design that is currently being constructed.  PX 23.

### B. Physical and Legal Characteristics of Southgate Road and Surrounding Area

The Southgate Road Parcel consists of 4.23 acres, approximately 3.6 of which were used for a paved two-way roadway and parking along the roadway, and 0.6 of which included a parking lot and grassland. SUF at ¶ 28. Before the taking, vehicles, pedestrians, and bicycles used Southgate Road to access the Base, the Pentagon, and the surrounding areas. A significant portion of weekday vehicle traffic—about 3,500 to 4,000 vehicles a day—used Southgate Road to travel to or from the Base and the Pentagon. Public parking was available on both sides of the westbound lane, but parking alongside the eastbound lane and in the parking lot was restricted to Army use. SUF at ¶¶ 23–24, 27. The County owned two-thirds of this parking lot, and the Government owned the other third. SUF at ¶ 27.

The parties presented evidence as to how both Southgate Road and Columbia Pike are legally categorized, focusing primarily on three classifications: 1) the zoning requirements for the Southgate Road Parcel, 2) the County's General Land Use Plan's ("GLUP") classification of the Southgate Road Parcel, and 3) the County's Master Transportation Plan's ("MTP") classification of the Southgate Road Parcel. The Southgate Road Parcel was zoned as S-3A under the Arlington County Zoning Ordinance at the time of the taking. SUF at ¶ 23. County Planner, Anthony Fusarelli ("Fusarelli"), testified that S-3A is one of the County's three public zoning categories, and that most of the "by-right uses"—meaning uses for which the land may be developed without further County approval—are of a public nature. A S-3A zone only permits the building of single family homes as of right on a minimum lot of 3 acres, meaning that only one single family home could be built on the Southgate Road Parcel under its current S-3A zoning. That zoning category also authorizes some public developments, such as for schools, for which only a use permit is needed. To build a residential development not authorized under the S-3A zoning plan, the County Board would have to approve a zoning amendment, and would

have to consider the GLUP's classification of the area at issue, as well as any sector plans, area plans, or special urban design plans for the area at issue.  Additionally, the Board would have to consider recommendations from the County Manager, who would have to consider recommendations from the County's planning staff, as well as input from attendees at public hearings.  Despite these requirements for a zoning change to be implemented, multiple County witnesses testified that these types of zoning amendments are relatively common.

Under the GLUP, the Southgate Road Parcel was designated for either government and community facilities or public use.  Fusarelli testified that, should the Southgate Road Parcel be put to use as a residential community, the County Board would need to amend the GLUP.  The County has a policy requiring that any request for a land use change not contemplated by a current land use policy must undergo a special study by the County's planning staff before the County Board could consider the change.  Fusarelli testified that this special study would be required for a GLUP amendment to develop the Southgate Road Parcel, and that this would be conducted before any consideration of zoning changes or GLUP amendments.  He also explained that GLUP amendments are common, that the County Board had approved approximately 20 to 25 GLUP amendments within the last five years, and that they are generally considered at the same time as proposed zoning changes.  DX 8.

Finally, the County's Master Transportation Plan Map designated Southgate Road and the portions of Columbia Pike and South Joyce Street as "Type B Arterial Streets" at the time of the taking, meaning they were defined as "Primarily Urban Mixed-Use," serving a dense, mixed commercial, residential, or governmental use.  PX 16.  Southgate Road is labeled as a "Minor Arterial Street," whereas Columbia Pike is labeled as a "Principle Arterial" street.  SUF at ¶ 21; PX 67.  Arterial streets have more frequent traffic than residential streets and "primarily provide

for 'through' travel rather than solely for access to adjacent properties." PX 16. Fusarelli testified that an amendment to the MTP would be warranted if Southgate Road were replaced with a new street that did not meet the design and functionality of a Type B Arterial street.[9] Amendments to the MTP would be considered by County staff, who would then present a recommendation to the County Board for approval at the same time as other amendments to use restrictions that would need to pass to develop a property. On average, it takes a developer 12 to 18 months to secure the authority to develop a property in the County.

The parties agree that the County never sought to use the Southgate Road Parcel for any purpose other than as a roadway, bike route, and for parking and utilities before it entered into land exchange negotiations with the Government. SUF at ¶ 30. The parties also agree that no one has ever approached the County about developing the Southgate Road Parcel for commercial or residential use, and that the County has never advertised it as available for development.[10] SUF at ¶¶ 31–33. The County presented evidence showing that at one point it intended to redesign Southgate Road to eliminate the described "obsolete and excessively wide-cross section" and narrow the roadway's entire width. DX 65. According to the Columbia Pike Neighborhoods Area Plan, developed in 2010, this change would have left Southgate Road as an access road for the Base, but also would have permitted expansion of the small neighborhood

---

[9] The Type B Arterial street designation was made around 2007, when the Navy Annex property still stood next to Southgate Road; however, at the time of the taking, the type of development around Southgate Road did not meet the average development for a Type B Arterial street. Because the property was "in flux" due to its designation as a location for future Cemetery expansion, the County never amended the MTP. Trial Trans. 224:7.

[10] Fusarelli testified that the County never envisioned any private use for the Southgate Road Parcel because of the anticipated Cemetery expansion, which had been planned as early as 1999; however, he also testified that the Southgate Road Parcel, as it is situated within the Columbia Pike corridor and the Crystal City and Pentagon City areas, would hypothetically be an area ripe for housing development.

park in the northeast corner of Foxcroft Heights, and would have made a parcel of land between

the two easternmost streets in Foxcroft Heights more attractive for development.  Id.  The parties

agree that the Southgate Road Parcel had a determinable fair market value at the time of the

taking.  SUF at ¶ 35.

### C.  Potential Development of the Southgate Road Parcel

The County presented two primary options for hypothetical residential developments on

the Southgate Road Parcel, under which multiple residential units could be built.[11]  Both options

were developed by a team led by Fusarelli for the purposes of negotiations over the Southgate

Road Parcel and for any potential litigation as to "just compensation" that might result.  He

testified that he was not directed to find a feasible development scenario under any

circumstances, and that there was no "predetermined outcome" of the would-be developments.

Trial Trans. 365:8–10.  The first option would include 28 townhomes and a 70-unit, four story

apartment or condominium building.  It would include 13,000 square feet of open space, and,

along the north edge of Southgate Road, adjacent to the Cemetery's south wall, there would be a

25-foot wide two-lane road.  The second option provides for 52 townhomes, no apartment or

condominium building, 12,000 square feet of open space, and the same 25-foot wide road

running along the north edge of the development.  The two options are represented below in

Figures 5 and 6, respectively.  See DX 14; DX 15.  Both options show the development fully

surrounded on three sides by the Cemetery.

---

[11] The County also presented testimony from the Government's appraisal expert of a third
option—a single family home on the eastern portion of the Southgate Road Parcel, over the
portion which at the time of the taking was a parking lot.  The expert, David Lennhoff,
concluded that this was the parcel's highest and best use under its current S-3A zoning, which
limits residential development to one residence per three acres.

**Figure 5**



**Figure 6**

Both plans presume passage of a rezoning amendment, as the first option would require RA8-18 zoning, and the second option R2-7 zoning. Fusarelli testified that he used these two zoning categories as guides because portions of the nearby Foxcroft Heights neighborhood are zoned under these two different categories. The townhomes in both proposals would face the Cemetery, and would be 40-feet high, 42-feet wide, have a 12-foot streetscape in front separating them from the road, and have a 27-foot rear yard. The proposed access road would directly abut

the Cemetery's existing south wall.  All of the townhomes would include a garage, but the proposed development sketches show no available visitor parking.  An email from Fusarelli to the County's appraisal expert, William O'Neill ("O'Neill"), shows that the 25-foot road likely could not accommodate street parking, but the 12,000 to 13,000 square feet of open space in each plan could accommodate visitor parking.

The proposed development plans do not specify how certain utilities necessary to develop the property could be effectively provided.  Although Southgate Road currently has a sewer line running underneath it, the plans introduced at trial do not account for how or where water, electric, or gas lines would be run to the property.  O'Neill testified that water lines could run through the Foxcroft Heights neighborhood, but also admitted that this would be a more expensive undertaking than running water lines through federal land.  Moreover, neither O'Neill nor any other witnesses at trial testified as to whether other utilities would be able to run through the Foxcroft Heights neighborhood.[12]  Strong federal opposition to any residential development supports the conclusion that the federal Government would not assist a developer in obtaining the necessary utilities.

Additionally, the Government's appraisal expert, Steven Roach ("Roach"), testified that the 25-foot street proposed in the development scenarios would run afoul of County subdivision regulations.  Because the County's proposals would divide the property into separate lots, the development would qualify as a subdivision under County regulations.  PX 29.  Section 23-6 of the County's regulations specifies that "in no case shall the width" of any new streets "be less

---

[12] Although the 1963 deed to Southgate Road included "an easement dated May 16, 1930, to Braddock Light and Power Company for a right-of-way for electrical transmission line along the south line of the Cemetery," this easement was only conveyed "for a period of 30 years from May 16, 1930," and no testimony at trial or other evidence indicated that an electrical line ran under the Southgate Road Parcel on the date of the taking.  PX 44.

than fifty (50) feet." The County's proposals and evidence presented at trial did not identify how a developer could resolve this issue with the County Board.

Uncontroverted evidence showed that the Government and supporters of the Cemetery would vigorously oppose any attempt to develop the Southgate Road Parcel given that the residential development would directly abut the expanded Cemetery on three sides, making the development, in effect, within the Cemetery. The Executive Director of Army National Military Cemeteries, Arlington National Cemetery, Karen Durham-Aguilera ("Durham-Aguilera"), testified as an expert on the management and mission of the Cemetery. In her testimony, she emphasized that the mission of the Cemetery is to provide a tranquil, dignified space to bury, visit, and honor the veterans and their family members who are buried there. To maintain this respectful environment, all activities within the Cemetery are strictly controlled by statute or subject to approval by the Executive Director. For example, the types of burial ceremonies are limited, as are picnicking and other recreation activities. No food, advertising, or vendors are permitted on the grounds.

Durham-Aguilera estimated that, on a weekly basis, she has denied requests to conduct ceremonies or events in the Cemetery that would be at odds with its mission. For example, when Capital Bikeshare approached the Cemetery about putting a bike share station on Memorial Avenue at the entrance to the Cemetery, she denied the request because the infrastructure necessary for a bike station would not be consistent with the mission of the Cemetery. Even when the Air Force sought to expand its footprint around the Air Force Memorial, she worked within the military system to deny this request because it would have subsumed space needed for burials at the Cemetery. Durham-Aguilera testified that if the County sought to develop the Southgate Road Parcel for residential use, she "would have been very strongly, absolutely

adamantly opposed to it" because the residences would effectively be in the "midst of Arlington National Cemetery," as the expansion plan at the date of the taking would have the Cemetery surround the Southgate Road Parcel on three sides.  Trial Trans. 150:13–14, 18–19.

Additionally, as Kelley testified, the graves closest to the masonry wall across from the Southgate Road Parcel—which, under the County's proposed development plans would run directly along the 25-foot road separating the wall and the townhomes—are some of the closest to the walls of the Cemetery.  Durham-Aguilera testified that she could not "conceive of having an active cemetery around a residence" because of:

> what that would do to us that are trying to bury our veterans and family members with the dignity and respect that they deserve, our families coming there to grieve their loved ones' graves, and then there is a residence somewhere in the midst of that.

Trial Trans. 150:19–25.

Durham-Aguilera testified that she would oppose any zoning amendments or variances to permit development of Southgate Road and would oppose running any utility lines underneath Cemetery property to Southgate Road.  To oppose these measures, she would enlist the support of her direct supervisor, the Secretary of the Army, and would alert the six Congressional oversight committees responsible for the Cemetery, as well as the independent Federal Advisory Committee Act committee, about any type of development proposals for the Southgate Road Parcel.  She also testified that, in response to the County's proposed residential development, one could expect that the many active military and veterans' support organizations "would do what they normally do on something they disagree with," which is to launch active media and legislative campaigns against the proposal.  Trial Trans. 157:9–12.  To show how strongly such groups react to decisions affecting the Cemetery, she described how she was the recipient of death threats from impassioned supporters of the Cemetery when, because of the COVID-19

pandemic, the Cemetery decided to suspend the "Wreaths Across America" program in 2020.[13] Based on this uncontradicted testimony, the Court finds that the outcry against a residential development within the Cemetery would be "very loud," and any development would face vigorous opposition from not only the highest levels of the Government, but also from individual groups who are passionate about maintaining the dignity of the Cemetery.  Id. at 160:7–10.

Durham-Aguilera testified that she was not aware of any residential development that directly abutted the Cemetery at the time of the taking.  Fusarelli also testified that he could not recall any residential development in the County surrounded on three sides by any cemetery. Although the Foxcroft Heights neighborhood is close to the Cemetery, and, as shown in Figure 7, will become closer with the Cemetery expansion, the portion of the Cemetery directly next to the neighborhood will be separated by the 55-foot South Nash Street, a boundary wall, and the Columbarium, which is a large structure.[14]

---

[13] The Wreaths Across America program involves tens-of-thousands of volunteers placing between 250,000 and 260,000 wreaths on the graves of fallen service members in the Cemetery during the holiday season.

[14] The Columbarium is designed for cremated remains, with niches in the walls to hold the cremated and inured remains of fallen service members.  See Military Funeral Honors – Columbarium Inurement, Arlington National Cemetery, https://www.arlingtoncemetery.mil/Funerals/Funeral-Information/Visiting-Clergy-Guide/Military-Honors-Columbarium-Inurnment.

**Figure 7**



Foxcroft
Heights
⟶

The County pointed to only one other residential development that it claimed to be close

to the Cemetery—the Memorial Overlook Condominium, which is located adjacent to the edge

of the opposite side of the Cemetery, near the Iwo Jima Memorial; however, unlike the County's

proposed development, the Memorial Overlook Condominium is approximately 150 to 200 feet

away from the Cemetery wall and is separated from that wall by two wide roadways, an expanse

of land, and multiple trees, as depicted in Figures 8 and 9.  DX 16.

**Figure 8**



24

**Figure 9**



By contrast, under the County's proposed development plans, townhomes would be 37

feet—the distance between the 25-foot roadway and the 12 feet of landscaping in front of the

homes—away from the Cemetery wall, and directly facing it, and, as shown in Figures 5 and 6, it

would be surrounded on three sides by the Cemetery. The Southgate Road Parcel's close

location within the Cemetery would be unique, and the Court finds that it would likely face

fierce, unified federal and veteran opposition.

To be sure, the County presented evidence showing that it has a significant need for

housing. Fusarelli testified that the Metropolitan Washington Council of Governments ("COG")

has forecast that the County's population will grow by approximately 80,000 residents between

2015 and 2045, which amounts to an approximate 35% increase in the County's population. The

County does not have sufficient housing to meet this increase, and, in the fall of 2019, the COG

Board called for an additional 14,000 housing units to be built in the County between 2020 and

2030 to meet this demand. From 2018 to 2022, the County Board approved the creation of

10,000 additional housing units, 8,000 of which were completed during this period. In March

2023, as a result of the Missing Middle Housing Study, the County Board approved zoning amendments that would provide for "by right" developments of multi-family units in areas previously zoned for only single family use. Fusarelli testified that there were hundreds of opponents to these zoning amendments and the accompanying GLUP amendments, yet the County Board nevertheless passed the Missing Middle amendments.

Fusarelli also gave two examples of private housing developments currently located in areas zoned as S-3A; however, neither is similar to the two options suggested by the County at trial. The first example was Marymount University dorms that were built within the southern limits of a portion of the campus zoned for S-3A use. The second example was the Arlington Mill development, a five-story apartment building that is part of a public-private partnership aimed at providing affordable housing, and is located on the west end of Columbia Pike within land zoned as S-3A.

The County also presented evidence of land that had been rezoned from S-3A to other uses. For example, the Holiday Inn hotel in Rosslyn was rezoned to allow for a redevelopment to include multiple residential units, as well as a mixed use area on the ground floor and lower levels. The County gave a number of other examples of property rezoned from S-3A zoning, some of which included GLUP amendments and other land use plan amendments; however, the County presented no testimony or other evidence at trial to indicate whether these other projects were otherwise similar to the Southgate Road Parcel. DX 2.

### III. CONCLUSIONS OF LAW

#### A. **Standard of Review**

Federal Rule of Civil Procedure 71.1 establishes the procedures for condemnation proceedings in federal courts, specifying that "[i]n an action involving eminent domain under federal law, the court tries all issues . . . except . . . compensation must be determined . . . by a

jury when a party demands one." Fed. R. Civ. P. 71.1(h)(1).  The United States Supreme Court

has interpreted this rule to confine the role of a jury in condemnation proceedings to a "single

narrow but important function—the determination of a compensation award within ground rules

established by the trial judge."  United States v. Reynolds, 397 U.S. 14, 20 (1970).  Specifically,

in a condemnation proceeding, the trial judge determines all facts except "the precise issue of the

amount of compensation to be awarded."  Id.

    **B.  Analysis**

    In a condemnation action, the Government must provide "just compensation" to the party

from whom it takes land through the power of eminent domain.  U.S. Const. amend. V.

Typically, the Government provides monetary compensation for the fair market value of the

land.  See 8.929 Acres, 36 F.4th at 254.  In some cases, it can provide substitute facilities for the

land taken; however, the Government cannot provide "hybrid" compensation by both paying the

fair market value of the property and providing substitute facilities.  8.929 Acres, 36 F.4th at

255.

    In this action, the County concedes that the substitute facilities provided are "just

compensation" for the Government's taking of the Columbia Pike parcel, which includes

Columbia Pike and portions of South Joyce Street, but seeks monetary compensation for the

taking of the Southgate Road Parcel.  Because hybrid compensation is not permitted, the County

can only receive fair market value for the Southgate Road Parcel if that parcel is severable from

the rest of the 8.929 acres.  Both parties, this Court, and the Fourth Circuit have recognized that

the core issue in this litigation is whether taking the Southgate Road Parcel "constitutes a unified

taking of an interconnected road network," or whether the Southgate Road Parcel is a separate

"valuable, developable property."  See 8.929 Acres, 36 F.4th at 257 ("[C]haracterizing the taking

as a unified whole or one involving divisible sections is the factual cornerstone issue of this

case."). For the reasons discussed below, the Court finds that the Southgate Road Parcel is not severable from the Columbia Pike and South Joyce Street parcels, and that the parcel was part of a unified, indivisible taking.

      1.  <u>Severability</u>

In a single condemnation proceeding, "any number of parcels of property might be included," <u>Convers v. Atchison, T. & S.F.R. Co.</u>, 142 U.S. 671, 674 (1892), and it is a court's role to determine whether a given parcel should be considered to be a part of a "larger parcel," which is "the whole property to be considered for compensation purposes," <u>8.929 Acres</u>, 36 F.4th at 260. "The general rule is that 'a parcel of land which has been used and treated as an entity shall be so considered in assessing compensation for the taking of part or all of it.'" <u>Id.</u> (quoting <u>United States v. Miller</u>, 317 U.S. 369, 376 (1943)). More specifically, to determine whether a parcel is severable from a larger parcel, "courts consider whether the parcels 'possess a unity of ownership and have the same, or an integrated, highest and best use.'" <u>Id.</u> (quoting Yellow Book at 23, 111).[15] Although courts will also look to the physical proximity of parcels, neither physical continuity nor unity of ownership is a dispositive factor for determining severability. <u>See</u> Yellow Book at 111; <u>Baetjer v. United States</u>, 143 F.2d 391, 394-95 (1st Cir. 1944); <u>Mountain Valley Pipeline, LLC v. 0.19 Acres of Land, Owned by Bohon</u>, 2022 WL 4484620, at *5 (W.D. Va. Sept. 27, 2022).

---

[15] The Yellow Book is <u>The Interagency Land Acquisition Conference, Uniform Appraisal Standards for Federal Land Acquisitions</u> (Appraisal Found. ed. 2016), found at https://www.justice.gov/file/408306/download. As the Fourth Circuit acknowledged, the Yellow Book is a commonly referenced source in takings cases and legislation. <u>8.929 Acres</u>, 36 F.4th at 247 n.6. It can be found in the record in its entirety at PX 121.

Before the date of the taking, the County owned all of the 8.929 acres in some form, so there is a "unity of ownership."[16]  Additionally, the parcels always shared physical continuity as the three roadways physically intersected.  PX 25.  The central dispute is whether the two parcels—Southgate Road, and Columbia Pike and South Joyce Street—share "the same, or an integrated, highest and best use."

Because "economic demands normally result in an owner's putting his land to the most advantageous use," United States v. Buhler, 305 F.2d 319 (5th Cir. 1962), "[i]n the absence of proof to the contrary, the highest and best use of property is presumed to be its current use" at the time of the taking, United States v. 69.1 Acres of Land, More or Less, Situated in Platt Springs Twp., Cnty. of Lexington, State of S.C., 942 F.2d 290, 292 (4th Cir. 1991).  If a landowner contends that the property has a different highest and best use than its current use, it has the burden to show that "this use is 'reasonably probable' and that the probability has a real market value."  Id.; see also Yellow Book at 102.  Although "[t]he owner may introduce evidence of the highest and best prospective use even though he has no plans to sell the property or utilize it for that use," id. (quoting Bd. of Cnty. Supervisors v. United States, 276 F.3d 1359, 1366 (Fed. Cir. 2002)), any hypothetical use must still be reasonably probable.  As the Supreme Court has stated:

> Elements affecting value that depend upon events or combinations of occurrences which, while within the realm of possibility, are not fairly shown to be reasonably probable should be excluded from consideration for that would be to allow mere speculation and conjecture to become a guide for the ascertainment of value—a

---

[16] The fact that the County merely held an easement over South Joyce Street does not change this outcome.  See Yellow Book at 113–14 ("Historically, unity of ownership (or unity of title) was held to require all property comprising a single larger parcel to be owned to precisely the same extent (e.g., in fee simple) by precisely the same owner.  But modern case law has recognized that at times, the strict traditional rule may ignore market realities that should in fairness be considered.")

> thing to be condemned in business transactions as well as in judicial
> ascertainment of truth.

Id. at 253 (quoting Olson v. United States, 292 U.S. 246, 257 (1934)).  "[R]easonable probability requires that the proposed use be one 'for which the property is adaptable and needed or likely to be needed in the reasonably near future.'"  Id. at 262 (quoting Olson, 292 U.S. at 255).  The plans for an alternative use for the property cannot be "merely speculative."  Id.  "[I]n determining a property's highest and best use, each potential use must be analyzed using four criteria: (1) physical possibility, (2) legal permissibility, (3) financial feasibility[,] and (4) degree of profitability."  8.929 Acres, 36 F.4th at 253–54 (quoting Yellow Book 102–03).  Here, the County has the burden to show that it is reasonably probable that the Southgate Road Parcel would have been used for residential development in the reasonably near future by establishing that the prospective uses for the Southgate Road Parcel meet the four criteria.

    a.  Physical Possibility

The County did not meet its burden to show that it would be physically possible to develop the Southgate Road Parcel for residential use.  The County's two hypothetical townhome development scenarios do not account for a central deficiency with these plans that was raised at trial, namely, the County did not show how a developer would provide the required utility services to the property.  In a typical development process, particularly one supported by the County, providing utility line access to a property may be routine and not something that limits the physical possibility of development; however, the evidence at trial demonstrated that the development of the Southgate Road Parcel would be far from typical. As shown in DX 14, DX 15, DX 51, and DX 52, the property would be surrounded on three sides by federal land that would eventually become the Cemetery, and, as Durham-Aguilera testified, the federal Government would vehemently oppose granting any easement to the County to run utility lines

underneath the Cemetery.  The Southgate Road Parcel currently has only a sewer line running under it, and, although not in the County's plans, O'Neill testified that water lines could be run from the Foxcroft Heights neighborhood, albeit at an increased cost to the developer.  Yet, the County put on no evidence showing whether other utilities—such as gas, electricity, or cable— could be run through the Foxcroft Heights neighborhood.  Without any evidence that certain utilities essential for residential development could physically run to the property in light of the federal Government's guaranteed opposition to granting an easement to the most direct path for those utilities, the County has not established that it is reasonably probable that these residential developments could physically be built on the Southgate Road Parcel.

b. <u>Legal Permissibility</u>

The County also did not show that it was reasonably probable that a proposed development would be legally permissible.  To build residences on the Southgate Road Parcel, the County Board would have to approve a number of changes to the property's legal status, many of which the County did not show would be reasonably probable in the face of intense opposition from the federal Government and veterans' groups.  The County would first need to rezone the Southgate Road Parcel for residential use,[17] because where zoning restrictions would make a proposed highest and best use impossible at the time of the taking, "it must be shown that there is a reasonable probability that such permit or license will be issued or that a re-zoning will occur to make the use legal."  Yellow Book at 108 (quoting <u>United States v. 480.00 Acres of Land</u>, 557 F.3d 1297, 1312 (11th Cir. 2009)).  To assess whether rezoning is reasonably probable, courts have looked to whether "variances had been permitted with respect to similarly

---

[17] Theoretically, a developer might try to secure a zoning variance in the alternative to rezoning; however, neither party presented evidence as to how this process would occur.

zoned parcels in the past," in addition to whether it is reasonably probable that the specific parcel

at issue will be rezoned. United States v. 33.92356 Acres Of Land, 585 F.3d 1, 8 (1st Cir. 2009);

see also U.S. ex rel. Tenn. Valley Auth. v. 1.72 Acres of Land In Tenn., 821 F.3d 742, 753 (6th

Cir. 2016).

  The County presented evidence that the County Board has regularly approved zoning

amendments, even those that face vocal opposition, such as the Missing Middle Amendments,

that there is a high demand for housing in the County, and that the Southgate Road Parcel's

location between the Columbia Pike corridor and the Crystal City and Pentagon City areas is an

attractive location for residential development. Additionally, the County presented evidence that

it had approved rezoning from the S-3A category to a category permitting multi-family,

residential by-right use in previous projects; however, none of the examples provided involved

rezoning land adjacent to Arlington Cemetery or any other cemetery. DX 2. Specifically, the

County failed to rebut the Government's strong evidence that the Cemetery's staff, private

supporters of the Cemetery, including veterans' groups, and the highest levels of the federal

Government, would vehemently oppose any attempt to rezone the Southgate Road Parcel for

residential use, and it has failed to show that the County Board would pass a zoning amendment

in the face of such opposition.

  The County tried to rebut this argument by pointing to the strong public opposition to the

recently passed Missing Middle rezoning proposal. That zoning change rezoned single-family

areas of the County to permit by-right multi-family developments. This argument fails because

it does not acknowledge that there was equally strong support for the Missing Middle zoning

change. Even with such strong support, it took three years to enact the zoning changes. There

was no evidence in the record of any public constituency campaigning for residential

32

development on the Southgate Road Parcel, and the uncontroverted evidence shows that there would be very strong public and political opposition to a zoning change.  Moreover, the County recently had to abandon efforts to rezone portions of Columbia Pike to allow for the Columbia Pike Streetcar rezoning proposal due to strong public opposition, which shows that when there is strong public opposition, zoning proposals can fail.

The County also did not identify any projects in which the County Board had approved rezoning specifically from S-3A zoning to residential use zoning that faced the kind of strong opposition by the federal Government described in this civil action.  The only evidence proffered by the County of other projects completed after initial federal opposition was testimony from the County's real estate expert Andrew VanHorn,[18] who stated that he had successfully completed development projects that the Federal Aviation Administration and the National Park Service initially opposed.  But, as VanHorn conceded, that opposition was only directed at height and signage restrictions, rather than the entirety of the projects, and he did not provide any evidence of strong citizen opposition.  Because the County did not show that it would likely overcome the opposition to rezoning the Southgate Road Parcel for residential development, it has failed to show that rezoning the Southgate Road Parcel for residential use is reasonably probable in light of uncontradicted evidence that there would be vociferous federal and veteran stakeholder opposition.

The County has also not shown that passage of any GLUP amendments needed to develop the Southgate Road Parcel for residential use is reasonably probable.  Again, even

---

[18] To some degree, the Court has discounted this witness's expert testimony because he was so strongly aligned with the County, having provided his expert services at no cost, admitting that most of his development work is done in Arlington County and the City of Alexandria, and that he had "at least biweekly" communication with County Manager Schwartz.  Trial Trans. 455:13.

though the County presented evidence showing that GLUP amendments are relatively common, DX 8, and that there is a high need to develop more residential units in the County, it has not shown that the Board would approve amendments to the GLUP in the face of intense federal and veteran opposition.

The County also has not shown that it is reasonably probable that it would be able to secure the necessary approvals to build a roadway along the northern portion of the Southgate Road Parcel, as is included in both development proposals and would be necessary to provide residents with access to their homes. The County Board would have to amend the MTP to build this roadway as it would not meet the County's requirements for a Type B Arterial street. Although the County presented evidence that amendments to the MTP are common, and Leach testified that the Southgate Road's classification as a Type B Arterial may have been a relic of a prior designation, the County did not present any evidence rebutting Roach's conclusion that construction of a roadway only 25 feet wide would violate the County's subdivision ordinances. For these reasons, the Court finds that the County has failed to meet its burden to show that its proposed redevelopment of the Southgate Road Parcel would be legally permissible.[19]

---

[19] The Government also made several arguments about the 1956 and 1963 deeds creating legal barriers to the County's proposed development. The Court finds that the deeds conveying the Southgate Road Parcel to the County in 1956 and 1963 do not make the potential development legally impermissible. The 1956 deed, conveying the westbound lane of Southgate Road, requires the County to "maintain the project constructed thereon." PX 44. Although the deed does not define "project," the deed refers to the project as the construction of a Navy Annex Access Road. Id. Despite the Navy Annex no longer existing, the deed appears to require the County to maintain a road within the westbound lane of Southgate Road. Both development proposals maintain a road, albeit a much narrower one, meaning the proposals would not violate the 1956 deed's restriction. The 1963 deed contains no explicit conditions or restrictions that would bar the two development proposals. Its reference to the reason for the Government's conveyance—a statute that permitted the Government to convey roadways for the purpose of "widening . . . a public highway, street, or alley,"—does not require the County to maintain a road on the eastbound lane. PX 42; PX 43.

c.  Financial Feasibility

The County has also not met its burden to show that the hypothetical development

proposals are financially feasible.  To be sure, the County presented evidence that new

residential developments in the County are in high demand given the population projections over

the next few decades and the lack of available housing; however, it did not refute testimony that

developing the Southgate Road Parcel would present significant financial hurdles for a

developer.  These hurdles would, in part, be due to the significant physical and legal obstacles to

development already discussed.  For example, O'Neill testified that without the Government's

cooperation, running water lines to the Southgate Road Parcel would be more expensive.

Additionally, the costs associated with combatting the federal and veteran opposition to

developing the land could deter a developer from choosing to develop the Southgate Road

Parcel.  Finally, the County presented no evidence as to the anticipated price range for the

residences proposed for the Southgate Road Parcel.

d.  Degree of Profitability

The County is correct that developing the Southgate Road Parcel for residential use—if

reasonably probable—would be more profitable than its current use as a public roadway;

however, because it has not shown that its development proposals are physically possible, legally

permissible, or financially feasible, it has not shown that the highest and best use of the

Southgate Road Parcel is for residential development, regardless of the profitability of the use. [20]

---

[20] Except for zoning and GLUP amendments, the analysis of all four factors applies with equal, if
not more, force to Lennhoff's proposal that the Southgate Road Parcel could be developed to
provide for one single-family home.

Because the Court finds that highest and best use of the Southgate Road Parcel is its current use as a road and that the Southgate Road Parcel is an interconnected roadway with Columbia Pike and South Joyce Street, it is not severable from the rest of the 8.929 acres.

    2.  Compensation

A condemnee must receive the same type of compensation for takings within the same "larger parcel." 8.929 Acres, 36 F.4th at 262. So-called "hybrid" compensation is not permitted. Id. Here, the County has accepted substitute facilities for the condemnation of the sections of Columbia Pike and South Joyce Street within the Project area. As the Southgate Road Parcel is part of an interconnected roadway with these portions of Columbia Pike and South Joyce Street, these roads are therefore part of the same parcel for purposes of "just compensation," and the County must receive the same type of compensation for all of them. In this case, the Court finds that the extensive redesign of Columbia Pike and South Joyce Street—as well as the construction of the two-lane South Nash Street—are reasonable and fair substitute facilities for the 8.929 acres taken.

In a condemnation action, whether the condemnee has received "just compensation" typically rests with the jury if a party has made a timely demand for a jury trial. Fed. R. Civ. P. 71.1. When the condemnor offers substitute facilities, the jury would decide whether the substitute facilities offered are "functionally equivalent" to the condemned facilities. 8.929 Acres, 36 F.4th at 257. The County made a timely demand for a jury to determine that issue, [Dkt. No. 42] at 11; however, it has conceded that, should the Court find that the Southgate Road Parcel is not severable from the rest of the 8.929 acres and that substitute facilities are an appropriate form of compensation for the entire project, the substitute facilities offered by the Government are the functional equivalent of those taken. 8.929 Acres, 36 F.4th at 257 n.12.

Specifically, "[t]he County expressly conceded the functional utility of the substitute facilities at oral argument" before the Fourth Circuit:

> [The Court]: If we were to determine that the district court . . . was correct to decide there was a singular taking, it was correct to decide that . . . the substitute facilities theory is appropriate in this case, then the question that would be left for the jury in theory is whether the actual substitute facilities were functionally equivalent as just compensation. And what I understood your answer . . . to be was that that's not something you contest.
>
> [The County]: That is correct, Your Honor. There would be no jury trial.
>
> [The Court]: So, there would be no question?
>
> [The County]: That's correct, Your Honor.

8.929 Acres, 36 F.4th at 257 n.12. As such, there remains no question of "just compensation" for a jury to decide.

## IV. CONCLUSION

For these reasons, the Court finds that the Southgate Road Parcel is an indivisible part of the 8.929 acres of land taken by the Government and not severable from Columbia Pike and South Joyce Street. Moreover, the substitute facilities offered—the extensive widening and realigning of Columbia Pike, the shortening of South Joyce Street, and the construction of the two-way South Nash Street—constitute "just compensation" for the taking of the 8.929 acres of land. Therefore, judgment will be entered in the Government's favor by an Order to be issued with this Memorandum Opinion.

Entered this 29 day of March, 2024.

Alexandria, Virginia

/s/

Leonie M. Brinkema
United States District Judge